**Will Riddell, OSB No. 195635**
1491 Commercial Street SE
Salem, Oregon 97302
Phone: (503) 269-8961
Email: will@riddell.lawyer
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| **BRYAN SECHRIST**, an individual,<br><br>Plaintiff,<br><br>v.<br><br>**ISOVOLTA INC.**, an Oregon corporation; and **ISOVOLTA AG**, an Austrian corporation,<br><br>Defendants. | **Case No.** 6:26-CV-01903<br><br>**COMPLAINT**<br><br>Sherman Act, 15 U.S.C. § 1; Clayton Act, 15 U.S.C. §§ 15 and 26<br><br>Jury trial demanded |

## INTRODUCTION

**1.** There are only two companies that make the decorative laminates lining the cabins of the world's airliners. Isovolta and Schneller compete for the same customers, exhibit at the same trade shows, and – for the small number of people who know how to sell their products – are the only two employers that matter. Instead of competing for that talent, Isovolta and Schneller agreed not to. But the agreement isn't written down. It's what they call a "gentlemen's agreement," under which neither company will hire the other company's employees. And both companies comply with it, which causes demonstrable anticompetitive effects in the market for their employees.

**2.** Plaintiff Bryan Sechrist has been on the receiving end of that agreement twice. In 2025, Schneller recruited him and then dropped him after Isovolta reminded Schneller that the two companies do not poach each other's employees. In 2026, after Sechrist resigned from Isovolta, Isovolta told Schneller he was leaving and asked Schneller not to hire him. Schneller obliged. When Plaintiff applied for an open sales position days after that request, Schneller didn't bother to interview him.

**3.** An agreement between competitors not to hire each other's employees is an agreement to allocate the market for those employees' services, and it violates Section 1 of the Sherman Act. Plaintiff brings this action to recover the damages this agreement has caused him and to obtain an injunction ending it.

## PARTIES

**4.** Plaintiff Bryan Sechrist is an individual and a citizen of North Carolina. From July 31, 2024 through August 24, 2026, Isovolta Inc. employed him as an Area Sales Manager, selling Isovolta's aircraft-interior decorative laminates to airlines, maintenance, repair, and overhaul facilities, material distributors, and sales agents in the eastern United States, Canada, and much of Asia. His employment was based at Isovolta Inc.'s headquarters in Harrisburg, Oregon, where he worked on site for three to four weeks at a time every three to four months. He otherwise worked from North Carolina or in the field. Isovolta Inc. paid him from Harrisburg and withheld Oregon income and payroll taxes from his wages in 2024 and 2025. He reported to Isovolta Inc.'s Director of Sales, Teresa Adams, who was based in Harrisburg, Oregon.

**5.** Defendant Isovolta Inc. is an Oregon corporation with its principal place of business at 495 Territorial Street, Harrisburg, Linn County, Oregon 97446. Isovolta Inc. manufactures decorative laminates, prepregs, and technical laminates for aircraft

interiors at its Harrisburg plant and sells them to Boeing, Airbus, cabin-interior suppliers, and airlines throughout the United States and the world. Its Chief Executive Officer, Andrew Healey, lives in Eugene, Oregon, and its registered agent is located at the Harrisburg address.

**6.** Defendant Isovolta AG is an Austrian stock corporation (Aktiengesellschaft) with its principal place of business in Wiener Neudorf, Austria. Isovolta AG owns and controls Isovolta Inc. and operates the two companies, together with an affiliate in Kassel, Germany, as a single business (the Isovolta Group) whose Aviation & Transportation division makes and sells aircraft-interior laminates worldwide from its three plants in Harrisburg, Wiener Neudorf, and Kassel. Healey runs all three plants as Chief Executive Officer of Isovolta Inc. and Senior Vice President of the group's Aviation & Transportation division, and he reports to the Isovolta Group's chief executive in Austria. Isovolta Inc. is the group's manufacturing and sales presence in the United States, it markets the group's aircraft-laminate lines under the group's brands, and its sales staff report through the group's sales leadership in Austria. Isovolta AG's sales executives direct the group's decorative-laminate sales worldwide, serve as the group's contacts with Airbus, and must approve the offers Isovolta Inc.'s sales staff make to customers selecting Isovolta material for new Airbus aircraft. In the matters alleged below, Isovolta AG's executives acted on behalf of both Isovolta AG and Isovolta Inc. Isovolta Inc. and Isovolta AG are referred to together as "Isovolta."

**7.** Non-party Schneller LLC ("Schneller") is a Delaware limited liability company with its principal place of business at 6019 Powdermill Road, Kent, Ohio 44240, and a subsidiary of TransDigm Group Incorporated. Schneller manufactures decorative laminates for aircraft interiors and sells them to Boeing, Airbus, cabin-interior

suppliers, and airlines throughout the United States and the world. Schneller is Isovolta's only significant competitor and its co-conspirator in the agreement alleged in this Complaint. Schneller acted through its officers and senior sales executives.

## JURISDICTION AND VENUE

**8.** This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 (a) and 15 U.S.C. §§ 15 (a) and 26.

**9.** This Court has personal jurisdiction over Isovolta Inc., which is incorporated in Oregon and has its principal place of business in Oregon.

**10.** This Court has personal jurisdiction over Isovolta AG. Section 12 of the Clayton Act, 15 U.S.C. § 22, authorizes service of process on a corporate antitrust defendant wherever it may be found, and Isovolta AG has substantial contacts with the United States. It owns and directs an Oregon subsidiary that manufactures and sells its products in the United States; its senior executives routinely travel to Harrisburg, Oregon, and meet with customers in the United States; and it directed the conduct alleged in this Complaint at an Oregon employer's workforce. Isovolta AG is also subject to jurisdiction under Oregon Rule of Civil Procedure 4 L and Fed. R. Civ. P. 4 (k) (1) (A), because it purposefully directed the conduct alleged in this Complaint at Oregon.

**11.** Specifically, Isovolta AG agreed with Schneller that Schneller would not hire the employees of an Oregon company, and it enforced that agreement against an Oregon-based employee, knowing that the resulting harm to competition would be felt in Oregon; and one of its senior executives, while visiting Harrisburg, Oregon, confirmed the agreement to Plaintiff there on August 12, 2026.

**12.** In the alternative, if Isovolta AG is not subject to the jurisdiction of the courts of general jurisdiction of any state, it is subject to this Court's jurisdiction under Fed. R. Civ. P. 4 (k) (2).

**13.** Venue is proper in this district under 28 U.S.C. § 1391 (b) (1) and (b) (2) and 15 U.S.C. §§ 15 (a) and 22. Isovolta Inc. resides in this district. A substantial part of the events giving rise to Plaintiff's claims occurred in this district, where Isovolta Inc. is headquartered, where Plaintiff's employment was based, where Isovolta carried out the agreement alleged below, and where an Isovolta executive confirmed the agreement to Plaintiff. Isovolta AG, a corporation that is not a resident of the United States, may be sued in any district under 28 U.S.C. § 1391 (c) (3). Divisional venue lies in the Eugene Division under Local Rule 3-2 because Plaintiff's claims arose in Linn County.

## GENERAL ALLEGATIONS

**14.** Decorative laminates are the thin, printed, flame-resistant sheets that cover the sidewalls, ceilings, overhead bins, lavatories, galleys, and bulkheads inside commercial aircraft cabins. They must meet the flammability, smoke, and toxicity standards of the Federal Aviation Administration and its foreign counterparts, and they must be qualified by aircraft manufacturers such as Boeing and Airbus before they can be installed on those manufacturers' aircraft.

**15.** The industry is highly concentrated. Isovolta and Schneller are the only two independent manufacturers in the world of the decorative laminates that Boeing, Airbus, and the airlines use; Boeing also makes laminates in-house for its own new aircraft, but it does not sell them in competition with Isovolta and Schneller. The two companies compete against each other for the business of Boeing, Airbus, cabin-interior suppliers, airlines, maintenance and repair facilities, and distributors throughout the

United States and the world. Each holds qualifications with both major airframers. Schneller describes itself as the world's largest supplier of interior laminates for commercial transport aircraft, and Isovolta supplies approximately 150 airlines.

**16.** Selling decorative laminates requires specialized knowledge that takes years to acquire. It requires familiarity with airframer qualification processes and specifications, with the flammability regulations, with the design and refurbishment cycles of airlines and cabin-interior suppliers, and with the small community of buyers of these products. There are few people who have that knowledge.

**17.** Schneller employs three or four sales professionals in the United States and one in South America. Isovolta Inc. employed only two, Sechrist and Adams, who between them handled Isovolta's aftermarket sales throughout the world. For an experienced decorative-laminate sales professional, Isovolta and Schneller are the only two employers whose business centers on his skills, and the only way to obtain a better position, higher compensation, or advancement without leaving the field is to move from one to the other. Other companies in the aircraft-interiors industry occasionally employ people with laminate experience, but they do not manufacture decorative laminates, they do not need or pay for the manufacturers' specialized product and qualification knowledge, and they pay substantially less.

**18.** Isovolta and Schneller therefore compete not only for customers but also for employees. Each is the natural alternative employer for the other's sales and technical staff, and, absent an agreement between them, each would have every incentive to recruit the other's experienced people and to bid for their services.

**A. The agreement not to hire each other's employees.**

**19.** Isovolta and Schneller have agreed that neither will hire the other's employees. Within the two companies, the arrangement is known and referred to as their "gentlemen's agreement." Rather than compete for each other's employees, the two companies have allocated those employees between themselves, reserving Isovolta's employees to Isovolta and Schneller's employees to Schneller.

**20.** The agreement is not in writing, and Isovolta and Schneller intended it to stay that way to avoid creating evidence of the agreement. Instead, the agreement is maintained through direct communications between the two companies, and it is enforced, as alleged below, by reminders and requests from Isovolta to Schneller when an Isovolta employee seeks to move.

**21.** The agreement is not ancillary to any joint venture, supply relationship, license, sale of a business, or other legitimate collaboration between Isovolta and Schneller. The two companies have no business dealings with each other beyond buying some of the same raw materials from the same suppliers. The agreement's only purpose and effect is to eliminate competition between Isovolta and Schneller for employees.

**B. Schneller recruits Plaintiff and Isovolta intervenes.**

**22.** Isovolta Inc. hired Plaintiff by an offer letter dated June 27, 2024, issued from its Harrisburg office. The letter offered the position of Area Sales Manager at a starting salary of $120,000 a year, and required a pre-employment screening in Eugene, Oregon.

**23.** Isovolta Inc. paid Plaintiff approximately $129,000 in 2025, and by 2026 his base salary was approximately $134,000 a year.

**24.** From April 8 through April 10, 2025, Isovolta and Schneller exhibited at the Aircraft Interiors Expo in Hamburg, Germany, the industry's principal annual trade show. Plaintiff attended for Isovolta.

**25.** On April 9, 2025, Schneller approached Plaintiff at the show and asked if he was interested in working for Schneller. Schneller told Plaintiff that it was reorganizing its sales accounts and territories and that it wanted him for a sales position. Plaintiff said he was interested and would think about it.

**26.** On April 10, 2025, which was the last day of the show, Isovolta's and Schneller's executives met at Schneller's booth for the champagne toast the two companies hold together each year on the show's final day. During that meeting, the day after Schneller approached Plaintiff, an Isovolta representative reminded Schneller, out loud, that the two companies do not poach each other's employees.

**27.** On April 19, 2025, Plaintiff emailed Schneller to follow up on its approach and to express his interest in the sales position he was told about. On April 23, 2025, Schneller's representative replied that Schneller was considering a new sales position in the United States and was working out the details before posting it.

**28.** Schneller posted the position in May of 2025, and Plaintiff applied through Schneller's online portal later that month. On May 29, 2025, Schneller wrote to Plaintiff that it had received his resume and application and wanted to schedule a time to talk. Schneller spoke to Plaintiff by phone on June 12, 2025, and spoke with him again about the position approximately two weeks later.

**29.** In mid-July 2025, Schneller told Plaintiff that it had decided not to offer him the position. It also told him why: Isovolta had invoked the companies' agreement at the Aircraft Interiors Expo, and Schneller did not want to have any issues with Isovolta.

**30.** Schneller thus declined to hire a candidate that it sought out on its own initiative, solely because Isovolta had invoked the companies' agreement months earlier.

**31.** Schneller's comparable sales positions pay approximately $180,000 to $200,000 a year plus a bonus of 10 to 15 percent, well above what Isovolta paid Plaintiff. Schneller hired someone else for the position, and Plaintiff stayed at Isovolta.

**C. Plaintiff resigns, and Isovolta enforces the agreement again.**

**32.** On July 30, 2026, a company in the aircraft-interiors industry that does not manufacture decorative laminates offered Plaintiff a position as its Director of Sales, and he accepted. On August 6, 2026, Plaintiff gave Isovolta Inc. notice of his resignation, effective August 24, 2026. On August 12, 2026, Isovolta Inc. terminated the employment of Adams, its Director of Sales and Plaintiff's supervisor.

**33.** Plaintiff worked on site at Isovolta Inc.'s Harrisburg, Oregon facility from July 1 through July 24, 2026 and again from August 3 through August 13, 2026, and he remained in Oregon until August 15. A senior Isovolta AG sales executive visited Harrisburg from August 10 through August 14, 2026. On August 12, 2026, at the Harrisburg facility, that executive asked Plaintiff to take a walk with him. Plaintiff explained why he was resigning and mentioned that he had nearly left Isovolta the year before, when Schneller approached him after the 2025 Aircraft Interiors Expo. In response, the executive confirmed to Plaintiff that Isovolta and Schneller had an agreement not to hire each other's employees.

**34.** Plaintiff left Isovolta on good terms. Isovolta thanked him in writing for his work and wished him well. He had no noncompetition, nonsolicitation, confidentiality, or arbitration agreement and no other contractual restriction on his future employment, and he signed nothing when he left.

**35.** Nonetheless, within days of the Isovolta AG executive's return to Austria after the discussion with Plaintiff, and on or before August 18, 2026, Isovolta telephoned Schneller. Isovolta told Schneller that Plaintiff and Adams would no longer be at Isovolta and asked that Schneller not hire them, in compliance with the companies' "gentlemen's agreement." Schneller complied with that request.

**36.** On August 26, 2026, Plaintiff applied through Schneller's website for an open Account Executive position. It was the same position Schneller had filled in 2025 with the candidate it "chose" over Plaintiff. The position had opened again when that other candidate resigned in August of 2026.

**37.** This time, Schneller did not interview Plaintiff or consider him for the position. On August 27, 2026, the day after he applied, Plaintiff confirmed to Schneller that he was serious about the position, but Plaintiff was told in response that Schneller would not hire him. He was also told that the person Schneller had hired for the position in 2025 had resigned days earlier. Plaintiff has heard nothing from Schneller ever since.

**38.** Plaintiff began work on August 25, 2026 in the Director of Sales position described in paragraph 32, at a base salary of $110,000 a year, substantially below what Isovolta paid him and far below what Schneller pays for comparable sales positions. Plaintiff remains excluded from employment at Schneller, the only other employer in the world whose business centers on his skills, for as long as the agreement between Isovolta and Schneller continues.

## D. The agreement's effect on competition.

**39.** Isovolta and Schneller are the two principal buyers of the services of experienced aircraft-interior decorative-laminate sales and technical professionals in the United States. Their agreement not to hire each other's employees eliminates the competition

between them for those services. It deprives those employees of the only competing employer for their specialized skills, suppresses the compensation and terms that competition for their services would otherwise produce, denies them the mobility on which their bargaining power depends, and allows each company to keep its employees without matching the offers made by a competitor.

**40.** The agreement has no procompetitive justification. It furthers no joint venture or other legitimate collaboration between the companies. It is not reasonably necessary to protect either company's confidential information, to the extent any exists. It serves no purpose except to stifle competition for employees.

**41.** The agreement has injured competition and has also injured Plaintiff. As a direct result of the agreement, Schneller refused in 2025 to hire an employee it had itself recruited, and Schneller refused again in 2026 to consider the application of a qualified candidate with two years of experience selling directly competing products, whom its own sales leadership had wanted to recruit only a year earlier.

**E. The relevant product and geographic market.**

**42.** To the extent a relevant market must be defined, the relevant market is the market for the services of experienced aircraft-interior decorative-laminate sales professionals in the United States. The "product" bought and sold in that market is the labor of those professionals. The professionals, including Plaintiff, are the "sellers." The manufacturers that employ them, Isovolta and Schneller, are the "buyers."

**43.** The agreement restrains competition on the buying side of the market, and its anticompetitive effects fall on the selling side, on the professionals whose compensation, mobility, and bargaining power depend on competition between the two buyers.

**44.** The services of experienced decorative-laminate sales professionals are a distinct product. Selling these laminates requires specialized knowledge such as familiarity with airframer qualification processes and specifications, with the flammability regulations, with the design and refurbishment cycles of airlines and cabin-interior suppliers, and with the small community of buyers of these products, together with working relationships with those buyers. That knowledge is acquired only by years of selling these laminates, and few people have it. Neither Isovolta nor Schneller can substitute a salesperson from another industry, or a new hire without that background, for an experienced decorative-laminate sales professional without investing years in training.

**45.** Because the agreement restrains competition among the buyers in this market, the market's boundaries are defined from the sellers' point of view. The question is not whether one experienced decorative-laminate sales professional can be replaced by another. It is which employers such a professional can practicably turn to as reasonable substitutes for employment with Isovolta or Schneller, and whether a small but lasting reduction in the compensation the two companies offer would cause enough of those professionals to leave for other employers to make the reduction unprofitable.

**46.** From the perspective of an experienced decorative-laminate sales professional, no employer other than Isovolta or Schneller is a reasonable substitute. No other company manufactures the decorative laminates that Boeing, Airbus, and the airlines use, so no other employer needs, or pays for, the product, qualification, and customer knowledge that makes such a professional valuable.

**47.** Other companies in the aircraft-interiors industry occasionally employ people with laminate experience, but they employ them in trivial numbers, they do not use that knowledge, and they pay substantially less. Sales positions outside the industry pay less

still and make no use of the professional's skills and relationships at all. Plaintiff's own experience shows the gap. Schneller's comparable sales positions pay approximately $180,000 to $200,000 a year plus a bonus of 10 to 15 percent; Isovolta paid Plaintiff a base salary of approximately $134,000 a year; and the position he took outside the two companies pays a base salary of $110,000 a year. A professional in this market therefore cannot move to another employer without a substantial loss of compensation and of the value of his skills. A small but lasting reduction in the compensation Isovolta and Schneller offer would not cause these professionals to leave for other employers in numbers sufficient to make the reduction unprofitable, because every other employer already pays less. Isovolta and Schneller are the only buyers to which the professionals in this market can practicably turn for employment in their field.

**48.** The commercial realities of the industry confirm the market. Isovolta and Schneller each treat the other as the only outside source of experienced decorative-laminate sales professionals. Schneller sought out Plaintiff, an Isovolta employee, when it needed one in 2025, and the two companies' agreement not to hire each other's employees exists precisely because each recognizes that the other is the only competing employer for those professionals' services. Compensation for these professionals is distinct from, and substantially higher than, compensation for sales positions elsewhere in the aircraft-interiors industry. The skills and relationships that command that compensation are peculiar to the sale of these laminates. And the pool of professionals is small: fewer than ten people in the United States are employed to sell these laminates.

**49.** The relevant geographic market is the United States, or alternatively it is global. The professionals in this market live and work in the United States and sell to customers throughout the United States and the world from there, by travel and by remote

communication. They are not tied to a single location. Plaintiff, for example, worked for Isovolta Inc. from North Carolina and in the field, with periodic work at Isovolta's Oregon facility, and Schneller recruited him for a sales position while he lived in North Carolina. Both companies recruit these professionals from throughout the United States. A professional in this market can therefore practicably seek employment anywhere in the United States, and the United States is the area in which Isovolta and Schneller compete with each other for these professionals' services.

**50.** Isovolta and Schneller together employ substantially all of the professionals in the relevant market and have market power in it. No other employer in the United States or the world employs people to sell aircraft-interior decorative laminates in more than trivial numbers, and no new employer can enter the market, because entry requires manufacturing decorative laminates that meet the flammability standards and hold the airframer qualifications described above, which no company other than Isovolta and Schneller does. As the only two buyers, the companies have, when they act together, the power that a single employer of every professional in the market would have: the power to hold compensation and other terms of employment below the levels that competition between them would produce, without losing those professionals to any other employer. Their agreement not to hire each other's employees is an exercise of exactly that power.

**51.** The agreement has produced actual anticompetitive effects in the relevant market, including the refusals to hire alleged above, the elimination of competitive bidding for the services of Isovolta's and Schneller's employees, and the suppression of those employees' compensation and mobility. Those effects harm competition among the buyers in the relevant market, and they are not offset by any benefit to competition in the separate market for Isovolta's and Schneller's laminates.

**F. Injury to Plaintiff.**

**52.** Plaintiff has been injured in his business and property by reason of the agreement between Isovolta and Schneller. In 2025, he lost the Schneller position that Schneller itself had initially approached him about, and thereby lost the difference between the compensation that position would have paid and the compensation he actually received at Isovolta, together with the benefits and advancement the position would have provided. Plaintiff instead remained at Isovolta on terms that would have improved had there been competition for his services.

**53.** In 2026, Plaintiff lost the opportunity to be considered for Schneller's open Account Executive position and for any other position at Schneller, and he took employment on terms far less favorable than Schneller provided. Plaintiff has lost wages, benefits, and other compensation, and he will continue to lose them.

**54.** Plaintiff's injuries flow directly from what makes the agreement unlawful: the elimination of competition between Isovolta and Schneller for the services of employees like him. Plaintiff is a participant in the restrained market, the agreement was invoked against him by name, and no other person has been more directly injured by it.

**FIRST CLAIM FOR RELIEF: VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1**

**55.** Plaintiff realleges and incorporates all of the allegations above.

**56.** Beginning at a time presently unknown to Plaintiff, but no later than April 10, 2025, and continuing to the present, Isovolta and Schneller entered into and have maintained a contract, combination, or conspiracy in restraint of trade, namely an agreement that neither would hire the other's employees.

**57.** Isovolta and Schneller are separate, independent, competing companies. Each acted through its officers and senior sales executives in forming, maintaining, and carrying out the agreement.

**58.** The agreement is a horizontal agreement between competitors to allocate the market for the services of their employees in the United States, and to refrain from competing in that market. It is a naked restraint, ancillary to no legitimate collaboration between the companies, and it is unlawful per se under Section 1 of the Sherman Act.

**59.** In the alternative, if the agreement is not unlawful per se, it is an unreasonable restraint of trade under the rule of reason. Isovolta and Schneller have market power in the relevant market alleged in paragraphs 42 through 51; their agreement has had substantial anticompetitive effects in that market, as alleged in paragraphs 39 through 41 and 51; and the agreement has no procompetitive justification that could not be achieved by substantially less restrictive means.

**60.** The agreement restrains interstate and foreign commerce, and Isovolta's and Schneller's business activities substantially affect interstate and foreign commerce. Among other things, both companies manufacture their products in one state and ship them to customers throughout the United States; both purchase materials across state and national lines; both recruit and employ people across state lines; and the agreement was formed and maintained through interstate communications and conduct.

**61.** Isovolta and Schneller entered into and enforced the agreement with the purpose and effect of eliminating competition between them for employees and of restraining the employment opportunities of those employees, including Plaintiff.

**62.** As a direct and proximate result of the agreement, Plaintiff has been injured in an amount to be proven at trial.

**63.** Under Section 4 of the Clayton Act, 15 U.S.C. § 15 (a), Plaintiff is entitled to recover three times the damages he has sustained, the cost of suit, and reasonable attorney fees, together with prejudgment interest.

**SECOND CLAIM FOR RELIEF: INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT, 15 U.S.C. § 26**

**64.** Plaintiff realleges and incorporates all of the allegations above.

**65.** The agreement between Isovolta and Schneller remains in effect today. Isovolta invoked it against Plaintiff and Adams as recently as August of 2026, and also confirmed its existence to Plaintiff that same month.

**66.** Plaintiff remains qualified for and interested in employment with Schneller. However, as long as the restraint of trade continues in effect, Plaintiff faces threatened and ongoing loss and damage of the kind the antitrust laws were designed to prevent, specifically exclusion from the only other employer in the world whose business centers on his skills, and the loss of the compensation and opportunities that competition for his services would otherwise produce.

**67.** Plaintiff has no adequate remedy at law for that continuing and threatened injury. Under Section 16 of the Clayton Act, 15 U.S.C. § 26, he is entitled to an injunction in the terms set out below:

**a.** prohibiting Isovolta from entering into, maintaining, enforcing, or communicating about any agreement with Schneller or any other employer to refrain from soliciting, recruiting, or hiring one another's current or former employees;

**b.** prohibiting Isovolta from requesting, encouraging, or inducing any other employer to refrain from hiring any current or former Isovolta employee; and

**c.** requiring Isovolta to notify Schneller and Isovolta's own employees, in writing, that no such agreement exists or will be enforced.

**68.** Plaintiff is entitled under 15 U.S.C. § 26 to an award of costs and attorney fees incurred in this case.

**DEMAND FOR JURY TRIAL**

Under Fed. R. Civ. P. 38 (b), Plaintiff demands a trial by jury on all claims.

**PRAYER FOR RELIEF**

Plaintiff requests that the Court enter judgment against Defendants, jointly and severally, as follows:

**a.** On Plaintiff's First Claim for Relief, for Plaintiff's damages in an amount to be proven at trial, and treble damages pursuant to 15 U.S.C. § 15 (a);

**b.** On Plaintiff's Second Claim for Relief, for a permanent injunction under 15 U.S.C. § 26 in the terms described in paragraph 67;

**c.** For Plaintiff's costs and attorney fees under 15 U.S.C. §§ 15 (a) and 26;

**d.** For prejudgment interest under 15 U.S.C. § 15 (a), or as otherwise allowed by law, and for postjudgment interest; and

**e.** For such other and further relief as the Court deems just and equitable.

Dated September 14, 2026.

*s/ Will Riddell*

**Will Riddell, OSB No. 195635**
1491 Commercial Street SE
Salem, Oregon 97302
Phone: (503) 269-8961
Email: will@riddell.lawyer
Attorney for Plaintiff